IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

|  |  |
|---|---|
| ROBERT O. and NANCY S., individually and as guardians of J.O., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>HARVARD PILGRIM HEALTH CARE, INC., and UNITED BEHAVIORAL HEALTH dba OPTUM,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:17-cv-1251-TC |

In this ERISA[1] case, Plaintiffs Robert O. and Nancy S., Massachusetts residents and the parents of J.O., have appealed Defendants' denial of their medical insurance claim for expenses incurred during J.O.'s treatment at Uinta Academy in Utah. Defendants Harvard Pilgrim Health Care (Harvard Pilgrim or HPHC) and United Behavioral Health dba Optum (UBH) contend that J.O.'s expenses are not covered by Robert's health care plan because (1) the plan does not cover non-emergency services of an out-of-state provider without pre-authorization, which Plaintiffs did not obtain, (2) the treatment at Uinta Academy was not medically necessary, and (3) Uinta provided primarily educational services, which the plan does not cover.

Both parties filed motions for summary judgment. For the reasons set forth below, the

_____

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461.

court finds that the Plaintiffs are not entitled to coverage for J.O.'s treatment at Uinta. Accordingly, Defendants' motion is granted and Plaintiffs' motion is denied.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Robert O. and Nancy S. are the parents of J.O., a minor, who has a long history of serious mental health and behavioral issues that began when she was a very young child. She has been treated over the years by a number of mental health care providers.

J.O. is the beneficiary of a group health insurance plan called Harvard Pilgrim HMO, Massachusetts (the Plan), which was provided to her father, Robert, as a benefit of his employment. The Plan is governed by ERISA.

The Plan covers treatment for mental health and substance abuse disorders. UBH, through a contract with Harvard Pilgrim, reviews and decides whether to grant Member claims for coverage of mental health and substance abuse services.

The coverage at issue concerns treatment J.O. received at Uinta Academy (Uinta), a boarding school in Utah that provides treatment to adolescent girls with mental health conditions. She spent fourteen months there. (On August 25, 2015, J.O. was admitted to Uinta, where she

---

[2] UBH has requested that the court judicially notice the contents of seven sets of information. (See Request for Judicial Notice, ECF No. 24-12.) Under Rule 201 of the Federal Rules of Evidence, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Four of the seven sets of information are websites. The remaining three are the biographical information of educational consultant James Meyer; the fact that "the Commonwealth of Massachusetts Health Policy Commission is an independent state agency, which, among other things, runs the Commonwealth's Office of Patient Protection"; and the contents of "Bulletin 2009-11, issued by the Commonwealth of Massachusetts Office of Consumer Affairs and Business Regulation, Division of Insurance." (Request for Judicial Notice at 2–3.) Most of the information does not fit the definition of information that can be judicially noticed. In addition, the information is not necessary to the court's decision. Accordingly, the court denies Defendants' request.

stayed until October 25, 2016.)

**Relevant Terms of the Plan**

To determine the scope of mental health benefits available, one looks at the Plan's

Benefit Handbook (sometimes referred to as the Summary Plan Description or SPD). (See

Administrative Record (AR) 00040, 00029–00031 (2016); AR 00221, 00211–00213 (2015).)[3]

For purposes of J.O.'s case, the most relevant language defining benefits and exclusions includes

the following:

- "The Plan covers both inpatient and outpatient mental health care to the extent Medically

  Necessary[.]" (AR 00231 (2015), AR 00051 (2016).)

- In addition, "[a]ll mental health care must be arranged through the Behavioral Health

  Access Center" and it must be "provided by a contracted Plan Provider" unless no in-

  network provider has the expertise needed to provide the required service, in which case

  pre-authorization is required (AR 00213, 00231 (2015), AR 00031, 00051 (2016)).[4]

- "Plan Providers" are "Providers of health care services in the Enrollment Area that are

  under contract to provide care to Members of your Plan." (AR 00219 (2015), AR 00038

  (2016).) Uinta, located in Utah, is not a Plan Provider.

- To be eligible for coverage, Mental Health Care services:

---

[3] Because the coverage at issue straddles two plan years, both the 2015 and 2016 Benefit
Handbooks apply, but there is no substantive difference between the language or relevant
coverage for those years. The Benefit Handbooks can be found in the Administrative Record
(AR) at AR 281–287 (the 2015 Benefit Handbook) and AR 19–93 (the 2016 Benefit Handbook).
In this order, when citing to the Handbook, the court provides two sets of citations referring
respectively to the 2015 and 2016 Benefit Handbooks.
[4] Other exceptions exist, but they are not applicable here. (AR 00211 (2015) (situations when
"the member needed emergency services"), AR 00030 (2016) (same); AR 00212 (2015) ("the
need for care first arose when the member was outside of the member's state of residence"), AR
00030 (2016) (same).)

must be provided either (1) at the office of a Licensed Mental Health Professional, or (2) at a facility licensed or approved by the health department or mental health department of the state in which the service is provided. … <u>To qualify, a facility must be both licensed as, and function primarily as, a health or mental health care facility.  A facility that is also licensed as an educational or recreational institution will not meet this requirement unless the predominant purpose of the facility is the provision of mental health care services</u>.

(AR 00231–00232 (2015); AR 00051 (2016) (emphasis added).)

- The Benefit Handbook excludes "<u>educational services</u> or testing, except services covered under the benefit for Early Intervention Services. No benefits are provided: (1) for educational services intended to enhance educational achievement; (2) to resolve problems of school performance…." (AR 00241 (2015) (emphasis added), AR 00062 (2016) (emphasis added).)

<u>**Communications with UBH about Coverage**</u>

In June 2015, after J.O.'s condition significantly deteriorated, Nancy began searching for alternative treatment options.  According to J.O.'s therapist's treatment notes, Nancy "reported that she is starting to look into therapeutic boarding schools."  (AR 01504.)  Similar notes were made throughout June and July 2015.  (<u>See</u> AR 01509–01513, 01515, 01517–01520.)  In August 2015, the therapist remarked in her notes that Robert and Nancy visited Uinta and decided to send J.O. there.  (AR 01522–01524.)  Nancy, in her search for treatment options, worked with "Larry Epstein PhD and an educational consultant James Meyers[*sic*]."  (July 30, 2015 Evaluation Notes from Massachusetts General Hospital, AR 01414.)

Although Nancy started exploring the idea of sending J.O. to a facility such as Uinta in early June 2015, she did not call UBH to ask about coverage until July 17, 2015.  During that call, which was documented in UBH's case notes (<u>see</u> AR 02007), Nancy told UBH that J.O.'s providers had recommended an out-of-network facility in Utah.  UBH reviewed J.O.'s benefits

with Nancy and advised her that J.O. did not have out-of-network mental health benefits. Nancy was told that if she wanted to follow the recommendation of J.O.'s providers and obtain coverage, UBH needed a single case agreement[5] with the recommended provider, assuming there was no appropriate in-network provider. Then UBH's representative advised Nancy "to have one of the providers call if the providers believe[d] that none of the [in-network facilities] would be appropriate for [J.O.]." (Id.) UBH also told Nancy that the facility (Uinta) "must be willing to complete the UR [utilization review[6]] process and submit claims[.]" (Id.)

Instead of having one of J.O.'s providers call, Nancy called UBH on August 10, 2015, this time telling UBH that J.O.'s psychiatrist and educational consultant determined that J.O. needed residential treatment at Uinta. (See Aug. 10, 2015 Case Note, AR 02008.) UBH again told Nancy that she had an HMO plan with no out-of-network benefits. Nancy told UBH that she was planning to send J.O. to Uinta the week of August 24, 2015, at which point UBH told Nancy that if the facility wanted to pursue coverage, the facility or a local behavioral health provider could contact UBH with the request.

After J.O. was admitted to Uinta (without approval from UBH), Uinta called UBH on September 23, 2015, to ask about benefits and was told that J.O. did not have out-of-network

---

[5] "Single case agreements are contracts between the insurer and the out-of-network provider that allow the consumer to see his or her out-of-network provider, usually at a negotiated in-network rate." Miriam Ruttenberg, Esq., Choice and Continuity of Care as Significant Health Issues for Equality in Mental Health Care, 10 J. of Health & Biomedical L. 201, 209 (2014); see also Ann M. Bittinger, Esq., At Great Cost: Physician Groups Going "Non-Participating" with Commercial Payors, 2018 Health L. Handbook 8 (2018) ("Single-case agreements … are reached between physician groups and health plans for individual out-of-network patients.") (internal quotations marks and citation omitted).

[6] "Utilization review can be defined as 'evaluation of the necessity, appropriateness, and efficiency of the use of medical services, procedures, and facilities." Peter H. Mihaly, Health Care Utilization Review: Potential Exposures to Negligence Liability, 52 Ohio St. L. J. 1289 (1991) (quoting T. Timmreck, Dictionary of Health Servs. Mgmt. 613 (2d ed. 1987)).

benefits.  (AR 02009.)  The case notes do not reflect any request by Uinta for authorization to provide covered services to J.O.

On September 16, 2015, Nancy called UBH again to ask about residential treatment benefits.  (See case note at AR 02010.)  UBH told Nancy once more that the Plan did not have an out-of-network benefit for behavioral health treatment unless no in-network facility could provide the appropriate services, in which case a single case agreement must be completed.

One month later, on October 14, 2015, Nancy called UBH asking about in-network residential treatment referrals.  (See case note at AR 02011–02012.)  This time, she claimed that J.O. had recently been depressed and cutting herself, and her provider recommended residential treatment.  UBH gave her a list of nine in-network facilities and told her that "an assessment for any level of facility based care is required as part of the precertification process.  The evaluation must be face-to-face, preferably with the provider of the requested [level of care]."  (AR 02012 (emphasis added).)  Nancy again asked about out-of-network benefits, and UBH again told Nancy that she had an HMO plan with no such benefits.  Nancy asked how to have UBH consider an exception if none of the in-network facilities fit her needs and was told that the out-of-network facility would need to assess J.O. "and then contact UBH to make a formal request for a single case agreement[.]" (AR 02011-02012.)

Six months later, on May 23, 2016, Nancy called UBH again.  She called "to inquire about benefits."  (See case note at AR 02013.)  The person taking Nancy's call "provided benefit information for all [levels of care]."  (Id.)  Nancy "requested referrals for [Residential Treatment Center]/therapist/MD via email[.]" (Id.)  The next day UBH emailed a list of twenty-nine in-network providers to Nancy.  (See AR 02013–02015.)

According to the case notes memorializing the telephone conversations between UBH

and Nancy, that was the last time Nancy contacted UBH to ask about coverage for J.O.  The records do reflect that on June 6, 2016, UBH attempted to get information from Uinta and arrange for a clinical review of J.O.  UBH left messages, but there is no evidence that Uinta returned UBH's telephone calls.  (See AR 02015–02017.)

**UBH's Denial of Plaintiffs' Claims**

In the meantime, Uinta submitted claims to UBH, all of which were rejected.

UBH submitted its first bill on November 11, 2015, a month and a half after J.O. enrolled at Uinta.  The bill covered treatment provided during the last week of August 2015.  On December 4, 2015, UBH issued an explanation of benefit form (EOB) denying the services with the explanation that "Your plan does not cover services you received from a non-network provider."  (See AR 00171, AR 01190.)

On December 8, 2016, and February 28, 2016, UBH issued EOBs denying coverage of treatment provided in September 2015 and October 2015.  UBH denied those bills for the same reason.  (See AR 00169, 00172, 01191–01194.)

Uinta submitted bills for monthly services between November 2015 and June 2016. UBH denied those bills as well.  (See AR 00171–00184.)

**Appeal of UBH's Decision**

On June 1, 2016, Nancy appealed UBH's decision to deny the claims.  As required by the Plan, Harvard Pilgrim reviewed the appeal.  (AR 00074, AR 00020.)  The appeal referred to three denials contained in the EOBs dated December 4, 2015, December 8, 2015, and February 28, 2016.  In those EOBs, UBH's stated reason for denial was that the Plan "does not cover services you received from a non-network provider."  (AR 00169–00172.)  Those denials

focused only on coverage through October 31, 2015. But Nancy's appeal letter focused on a broader period of time. She stated that although she was

> not in possession of all of [UBH's] Explanations of Benefits regarding [J.O.'s] claims, including her claims for dates of service November 1, 2015 going forward to the present [i.e., June 1, 2016], these associated claims were also submitted for payment and it is my understanding that these claims have or will also be denied. **You need to consider all of her claims for dates of service [beginning] August 25, 2015[,] and going forward during this appeal review.**

(June 1, 2016 Appeal Letter, AR 01153 (emphasis in original).) Although the appeal seeks payment for services provided between August 25, 2015, and June 1, 2016, her letter is also an indirect, and procedurally incorrect, request for approval of and an agreement to pay for future treatment of J.O. at Uinta for an unspecified period of time.[7]

She briefly addressed the pre-authorization issue by stating that UBH "has previously authorized treatment that [J.O.] has received from out-of-network providers." (AR 01185.) She also enclosed copies of the authorization letters, which were issued between January 2011 and November 2014. (See id.)

But much of the appeal brief contained a lengthy description of J.O.'s condition and behavioral health history. Attached to the brief were a number of exhibits, including a one-page letter dated March 4, 2016, that was signed by two of J.O.'s treating providers: Dr. Thomas Spencer and Laura McSparron, LICSW. (AR 01528.) That letter briefly described J.O.'s medical history and concluded, with no discussion, the following:

> In the summer of 2015, it became the opinion of [J.O.'s] treatment team that a more intensive and long-term treatment option would be needed to help stabilize [J.O.] and give her the intensive therapy and support she needs. All outpatient and short-term inpatient interventions had been exhausted and the family began to explore long-term residential options. As no appropriate options were found

---

[7] Harvard Pilgrim, as stated in its June 30, 2016 denial letter, treated the appeal as a request for retroactive coverage of services from October 25, 2015, to June 6, 2016. (AR 00001.)

locally, [J.O.] was ultimately admitted to a long-term residential treatment center out-of-state that appeared best suited to meet her needs.

(Id.)

Also attached to the appeal brief was a letter from James Meyer, the educational consultant, explaining his recommendation that J.O. attend Uinta. (See AR 01169 (quoting January 24, 2016 Letter, attached as Ex. 14 to appeal brief).) Mr. Meyer is not a medical professional and his letter did not provide any support for the conclusion that J.O.'s treatment at Uinta was medically necessary or that no in-network provider would suffice for J.O.'s treatment. Nancy also quoted (and enclosed) a January 26, 2016 letter from Russ Pryor, LCSW and Associate Executive Director at Uinta, explaining why he believed J.O. needed treatment at Uinta. (AR 01183–01184.) As was the case with Mr. Meyer's letter, Mr. Pryor did not provide support for a medical necessity decision or the conclusion that J.O.'s needs could not be treated by an in-network provider.

The only other medical opinion Nancy submitted was a September 2015 psychiatric evaluation performed by Dr. Bret Marshall, Uinta's psychiatrist. That document set forth recommendations for treatment, but did not address the medical necessity issue or the need to go outside of the Plan's network of Providers. (See AR 00184.)

Nancy also attached J.O.'s medical records. The appeals committee at Harvard Pilgrim (the Committee) sent the medical records to MCMC, an independent medical review company, to obtain an opinion from a specialist about whether the treatment was medically necessary.

**Harvard Pilgrim's Denial of Coverage on Appeal**

An MCMC board-certified psychiatrist reviewed the records and determined that the residential treatment stay from August 25, 2015, through June 6, 2016, was not medically necessary. (See AR 01953–01955.) The psychiatrist opined that residential treatment was not

the appropriate level of care. UBH's Level of Care Guidelines define a "Residential Treatment Center" as follows:

> A sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in inpatient.
>
> The course of treatment in a Residential Treatment Center is focused on addressing the "why now" factors [8] that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care.

(AR 02059.)

The psychiatrist concluded that J.O.'s situation did not warrant months of residential mental health treatment. Instead, he opined that she should first have been observed for forty-eight hours to determine if she needed inpatient care. The MCMC reviewer noted, that given J.O.'s "recent dangerous and unpredictable behavior, she met criteria for the Inpatient Mental Health level of care," which could have ensured her continued safety, evaluated her clinical needs, and initiated a course of treatment. (AR 01954; see also June 30, 2016 Denial Letter at AR 00002.) The psychiatrist then opined that after J.O. received inpatient care, she should have been treated (1) at the partial hospitalization level of care for a short stay (from August 25 to October 1, 2015), then (2) at the intensive outpatient level of care for approximately three months (from October 2, 2015, until December 31, 2015), and finally (3) at the outpatient level of care from that point onward (January 1 until June 6, 2016). (AR 01953.)

---

[8] The "why now" admission criteria give the following examples of the need for admission to a residential treatment center: "Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered," and "Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care." (AR 02059–02060.)

On June 30, 2016, the Committee affirmed UBH's denial of coverage.  (See AR 00002.) The Committee noted that J.O. did not obtain the necessary pre-authorization.  In connection with that requirement, it also determined that because J.O. generally did not have out-of-network benefits and she did not satisfy the criteria necessary to excuse her reliance on in-network facilities, she was not covered.  They pointed out that her situation was not an emergency.  And the circumstances did not warrant coverage for the more intensive residential treatment level-of-care she sought.  In other words, Uinta's treatment of J.O. was not medically necessary.

The Committee also found that Uinta is "a therapeutic boarding school that is in a residential setting."  (Id.)  The Plan bars coverage for treatment at that type of facility: "A facility that is also licensed as an educational or recreational institution will not meet this requirement [that it function primarily as a health or mental health care facility] unless the predominate purpose of the facility is the provision of mental health care services."  (AR 00232 (2015), AR 00051 (2016).)  Defendants determined that Uinta provided "educational services or testing" to J.O., a service that is excluded from coverage.  (AR 00241 (2015), AR 00062 (2016).)

Finally, the Committee, noting that a member must show that no in-network facility can provide the necessary treatment, determined it did not need to reach that issue because, regardless of which facility provided residential mental health treatment, J.O. did not qualify for that level of care.  "[T]here was no question of 'no' in network facilities available [in the Enrollment Area] because [J.O.] did not meet level of care for residential treatment."  (June 30, 2016 Denial Letter, AR 00002.)

**External Medical Review**

As the Plan allowed, Nancy sought an external independent medical review on October 28, 2016.  (AR 00077, 00291, 02065.)  On February 2, 2017, the independent medical reviewer

upheld the denial because the mental health residential treatment was not medically necessary. (AR 00295, 00301.)  The reviewing doctor determined that J.O.'s illness and the proposed treatment was not so complex or unique that the care had to be provided out-of-network: "She did not receive any special treatments that are not considered routine in such settings throughout the country." (AR 00301.)  The independent doctor also concluded that the services did not meet the Massachusetts State Medical Necessity Definition.  (Id.)

J.O.'s parents filed suit in this court in December 2017.

## ANALYSIS

Plaintiffs seek recovery of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B).  Both parties have filed motions for summary judgment, which in an ERISA case, are simply "a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."  LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation marks and citations omitted).

The court, upon reviewing the record, finds that Plaintiffs have not met their burden to establish their right to benefits for Uinta's treatment of J.O.  The court's primary reasons are twofold.  First, Plaintiffs' claims are barred because they did not obtain the necessary pre-authorization before enrolling J.O. at Uinta.  Second, Uinta's treatment of J.O. was not medically necessary.  Accordingly, the court finds in favor of the Defendants.

## Standard of Review

In an ERISA case, the denial of benefits "'is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or the construe the terms of the plan.'" Id. (quoting Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  Here the parties agree that the de novo

standard applies.

Although the de novo review is restricted to the administrative record, Hall v. UNUM

Life Ins. Co. of Am., 300 F.3d 1197, 1202 (10th Cir. 2002),[9] the court does not give deference to

UBH's decision.

> When applying a de novo standard, the court reviews a denial of benefits to
> determine whether the administrator … made a correct decision.  The
> administrator's decision is accorded no deference or presumption of correctness.
> The review is limited to the record before the administrator and the court must
> determine whether the administrator properly interpreted the plan and whether the
> insured was entitled to benefits under the plan.

Hoover v. Provident Life & Acc. Ins. Co., 290 F.3d 801, 808–09 (6th Cir. 2002) (internal

quotation marks and citations omitted), quoted in Niles v. Am. Airlines, Inc., 269 F. App'x 827,

832 (10th Cir. 2008) (unpublished).

Under a de novo review, the Plaintiffs bear the burden of proving entitlement to benefits

by a preponderance of the evidence, while the Defendants bear the burden of showing that the

loss falls within an exclusionary clause of the policy.  See, e.g., Rasenack ex rel. Tribolet v. AIG

Life Ins. Co., 585 F.3d 1311, 1319 (10th Cir. 2009); Pitman v. Blue Cross & Blue Shield of

Okla., 217 F.3d 1291, 1298 (10th Cir. 2000); McGee v. Equicor-Equitable HCA Corp., 953 F.2d

1192, 1205 (10th Cir. 1992); Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.,

852 F.3d 105, 112–13 (1st Cir. 2017) (under the de novo standard of review, the burden is on

plaintiff to show entitlement to benefits); Niles v. Am. Airlines, Inc., 563 F. Supp. 2d 1208, 1215

(D. Kan. 2008) ("Because this case is being reviewed de novo, the burden of proof remains with

---

[9] The Hall decision identifies exceptional circumstances that may warrant supplementation of the administrative record, but the parties do not argue that such circumstances exist here.

the plaintiff to prove by a preponderance of the evidence that she is totally disabled within the meaning of the Plan.") (citing <u>McGee</u>, 953 F.3d at 1205).

General principles of contract law apply when constructing an ERISA plan de novo. <u>See Salisbury v. Hartford Life & Acc. Co.</u>, 583 F.3d 1245, 1247 (10th Cir. 2009) ("An ERISA plan is nothing more than a contract….") (internal quotation marks and citation omitted). "Courts review ERISA claims as they 'would any other contract claim by looking to the terms of the plan and other evidence of the parties' intent. If plan documents are reviewed and found not to be ambiguous, then they may be construed as a matter of law.'" <u>Cardoza v. United of Omaha Life Ins. Co.</u>, 708 F.3d 1196, 1203 (10th Cir. 2013) (quoting <u>Hickman v. Gem Ins. Co.</u>, 299 F.3d 1208, 1211 (10th Cir. 2002)). "Language is to be given 'its common and ordinary meaning as a reasonable person in the position of the [plan] participant ... would have understood the words to mean.'" <u>Hickman</u> at 1212 (quoting <u>Blair v. Metropolitan Life Ins. Co.</u>, 974 F.2d 1219, 1221 (10th Cir. 1992)) (internal quotation marks and citation omitted).

## **J.O.'s Stay at Uinta is not Covered by the Plan.**

Plaintiffs did not obtain preauthorization for coverage of Uinta's out-of-network services, so that alone summarily bars recovery. Additionally, Uinta's treatment of J.O. was not medically necessary, as was articulated in two separate and independent psychiatrists' evaluations on the record. Nothing in the record substantively refutes those expert conclusions.

### **Uinta's Out-of-Area Non-Emergency Services Were Not Preauthorized**

Upon review of the Plan's language, one cannot reasonably dispute that a Plan member who wants to obtain coverage for the non-emergency services of an out-of-network provider, such as Uinta, must, at a minimum, receive preauthorization from UBH. Plaintiffs were aware of

that requirement but they did not satisfy it.

Despite the Plan language, Plaintiffs contend that lack of preauthorization does not bar recovery: "Although the Plan offers assistance to members in finding non-network providers and requires authorization for out-of-network treatment, the Plan does not prescribe any penalty for failing to obtain [such authorization]."  (Pls.' Opp'n to Defs.' Mot. Summ. J. at 18, ECF No. 27; Pls.' Mot. Summ. J. at 28, ECF No. 25 ("There is no provision in the Plan specifically prescribing a denial of coverage for medically necessary mental health treatment received from a non-network provider without prior authorization.").)  But the Plan language they cite to (but do not quote) essentially says the opposite:

> Covered Benefits **must be received** from a Plan Provider to be eligible for coverage.  **However**, there are **specific exceptions to this requirement**.  Covered Benefits from a provider who is not a Plan Provider will be covered **if** one of the following exceptions applies:
>
> 1) The service was received in a Medical Emergency. …[10]
>
> 2) The service was received while you were outside of the Service Area and coverage is available under (1) the benefit for temporary travel or (2) the benefit for Dependents living outside of the Enrollment Area. …[11]
>
> **3) No Plan Provider has the professional expertise needed to provide the required service.  In this case, services by a Non-Plan Provider must be authorized in advance by us, unless one of the exceptions above applies.**
>
> 4) Your physician is disenrolled as a Plan Provider or you are a new Member of the Plan, and one of the exceptions stated in section I.E. SERVICES

---

[10] J.O.'s situation did not present a medical emergency, as defined by the Plan.  (See AR 00038 (2016); AR 00218 (2015).)

[11] This exception does not apply to J.O.  She was not temporarily traveling to Utah.  She was taken in the middle of the night from Massachusetts and transported to Uinta after weeks of investigation and planning.  (AR 01172.)  In addition, J.O. was not a "Dependent living outside of the Enrollment Area" (for example, a college student).  (See AR 00246 (2015 Handbook describing Out-of-Area Dependent Coverage).)  She was living at home in Massachusetts before she was sent to Utah specifically for treatment.

PROVIDED BY A DISENROLLED OR NON-PLAN PROVIDER applies.
… [12]

(AR 00030–00031 (emphases added).)  Of the four exceptions, the only applicable one is the

third (emphasized above).

Even assuming no Plan Provider could give J.O. the necessary treatment,[13] the services

<u>must</u> be authorized by UBH.  The word "must" is a command.  And the next phrase, "authorized

in advance by us," can only reasonably be read to mean UBH must agree to provide coverage of

that Non-Plan Provider's services <u>before</u> the Non-Plan Provider treats the member.  If there is no

authorization in advance, the Member does not get reimbursed.  That is not a penalty; it is the

consequence for failing to fulfill a contractual requirement.

Plaintiffs then assert that Harvard Pilgrim "cannot penalize [Robert] and Nancy and deny

coverage to J.O. for failure to seek authorization for her treatment without providing them with

proper notice."  (Pls.' Opp'n to Defs.' Mot. Summ. J. at 18, ECF No. 27.)  To support that

statement, they cite to 29 U.S.C. § 1022, which requires an employee benefit plan to provide a

Summary Plan Description to participants and requires the SPD to contain certain information.

But Plaintiffs do not articulate what information they believe was missing or withheld.  To the

contrary, based on a review of the record, Plaintiffs had sufficient notice, not only in the Plan's

plain language but also through the information UBH representatives provided to Nancy during

telephone calls about the nature of J.O.'s benefits and the pre-authorization requirements for

J.O.'s treatment at Uinta.

Plaintiffs, approaching the issue from a different perspective, contend that they <u>did</u> seek

authorization for J.O.'s residential treatment.  (<u>Id.</u> at 18–19.)  They note that during Nancy's

---

[12] Again, this exception does not apply.  Uinta was not "disenrolled" as a Plan Provider and J.O.
was not a "new Member of the Plan."
[13] Arguably the Plaintiffs have not even shown that, but the court need not reach that issue.

August 10, 2015 call to UBH, the representative "advised Nancy that 'if facility [Uinta] continued to pursue coverage facility or local providers can contact UBH with request." (Id. at 19 (quoting case note at AR 02008).) On September 3, 2015, a week after J.O. had been admitted to Uinta, someone from Uinta "contacted HPHC regarding J.O.'s eligibility for coverage, but was told that there was no coverage for out-of-network treatment." (Id. (citing case note at AR02009).) This, they say, shows that "Nancy followed UBH's instructions." (Id. at 11.) At most, this shows that she asked Uinta to contact UBH. And the note of the call says only that Uinta called to ask, generically, about J.O.'s out-of-network benefits, and was told that there are none. (AR 02009.)

Plaintiffs imply that UBH was not responsive to their alleged request for preauthorization. Nancy says "she felt she was going in circles in her attempts to obtain authorization for J.O.'s treatment." (Pls.' Opp'n at 11.)

UBH told her what she needed to know, but Nancy, as well as UBH and J.O.'s providers, did not follow through. Although Nancy was told three times about the potential for a single case agreement, there is no evidence that she communicated that requirement to Uinta. There is no evidence that Uinta called UBH to request a single case agreement, much less that Uinta made any meaningful effort to obtain one.

Despite the clear communications to Nancy, the lack of evidence that anyone provided the necessary documents, and the Plan's plain language, Plaintiffs assert that (1) they attempted to obtain pre-authorization but were not successful because UBH somehow left Nancy "going in circles," and (2) the Plan does not penalize a member for failing to obtain pre-authorization. As described above, Plaintiffs' position has no basis in the record or the Plan's plain language. In

short, Plaintiffs have not met their burden to show that they obtained pre-authorization for J.O.'s treatment at Uinta. This forecloses recovery.

Consequently, the issue of whether no in-network provider could have effectively treated J.O. is moot. The Plan requires the member seeking out-of-network coverage to show that "no in-network provider has the expertise needed to provide the required service, in which case pre-authorization is required." (AR 00213, 00231 (2015), AR 00031, 00051 (2016)). The phrase "pre-authorization" means that the Plan required Plaintiffs to show that an in-network provider was not available <u>before</u> sending J.O. to Uinta. At that point the pre-authorization procedure would have been triggered. But J.O.'s providers and parents went forward without consensus from UBH. They did not provide evidence until they appealed to Harvard Pilgrim seeking retroactive coverage. Even if that evidence were to show that no in-network provider could provide the required treatment, Plaintiffs' evidence came too late.

**Uinta's Treatment of J.O. was not Medically Necessary.**

Apart from the pre-authorization issue, two independent psychiatrists concluded that residential treatment was not medically necessary, and that the services at Uinta in particular were not medically necessary. Plaintiffs challenge the validity of those conclusions, asserting that the reviewers' opinions are not entitled to the same weight as the conclusions expressed by J.O.'s treating providers. They cite to written communications by Larry Epstein, Ph.D., Russ Pryor (Associate Executive Director of Uinta and LCSW), Bret Marshall, M.D. (the psychiatrist at Uinta), James Meyer (the educational consultant), and Dr. Thomas Spencer and Laura McSparron, LICSW.

Dr. Epstein, Mr. Pryor, Dr. Marshall, and Mr. Meyer did not offer medical necessity opinions. But Dr. Spencer and Ms. McSparron, J.O.'s providers, wrote a letter "to whom it may

concern" on March 4, 2016 that offered their opinion that J.O. needed the services provided by Uinta. The letter generally described some of J.O.'s mental health treatment history, and then offered the following conclusion:

> In the summer of 2015, it became the opinion of [J.O.'s] treatment team that a more intensive and long-term treatment option would be needed to help stabilize [J.O.] and give her the therapy and support she needs. All outpatient and short-term inpatient interventions had been exhausted and the family began to explore long-term residential options. As no appropriate options were found locally, [J.O.] was ultimately admitted to a long-term residential treatment center out-of-state that appeared best suited to meet her needs. At this placement, [J.O.] can receive ongoing treatment and supervision in a setting that will keep her safe as well as allow her to grow and make long-lasting changes.

(AR 01528 (emphasis added).) The opinion of Dr. Spencer and Ms. McSparron was conclusory. Nevertheless, the Plaintiffs contend that the letter should be given more weight than the independent medical reviewers' opinions.

Under ERISA, a treating physician's opinion need not be given more credence than an independent reviewing physician's opinion. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); Eugene S. v. Horizon Blue Cross Blue Shield of N.J., 663 F.3d 124, 1134–35 (10th Cir. 2011). The conclusory statement in the Spencer/McSparron letter, unsupported by any analysis, does not have the weight of the independent reviewers' opinions which were based on a substantial set of medical records, including treatment notes from the facility itself. The reviewers also provide specific reasons for their conclusions, as opposed to Dr. Spencer and Ms. McSparron.

Plaintiffs also take issue with what they believe are inconsistencies in the two independent reviewers' opinions. Their objection is not persuasive.

First, Plaintiffs assert, incorrectly, that "HPHC based its denial of benefits to J.O. based on completely contradicting rationale based on the MCMC and IMEDECS reports." (Pls.' Mot. Summ. J. at 37.) The Committee at Harvard Pilgrim did not have the benefit of the IMEDECS

decision, which was issued after the Committee denied Nancy's appeal.  Accordingly, Harvard

Pilgrim could not have taken into account any inconsistencies claimed by the Plaintiffs in their

briefs to the court.  Moreover, the Benefit Handbook states that the decision by the IMEDECS

reviewer was binding on Harvard Pilgrim.  (See AR 00077, AR 00152.)

Second, nothing in the record suggests that the independent reviews were improperly

conducted.  Each reviewing psychiatrist made his or her own determination of medical necessity

based on his or her own experience and the resources cited.  While the IMEDECS psychiatrist

did not repeat the reasoning of the MCMC psychiatrist, each concluded, based on his or her own

professional expertise and the voluminous medical records, that J.O. did not need residential

treatment.  Although the reviewers approached the question differently, they reached the same

conclusion:  Uinta was not an appropriate treatment level for J.O.

The court credits the opinions of the independent medical reviewers.  Accordingly, the

court finds that Plaintiffs have not satisfied their burden to show that J.O.'s treatment at Uinta

was medically necessary.

### Was Uinta a Therapeutic Boarding School or a Residential Treatment Center?

The court will not address the question of whether Uinta was a therapeutic boarding

school or a residential treatment center.  As noted above, even if Uinta was a residential

treatment center, coverage of its services was not pre-authorized and J.O.'s treatment at Uinta

was not medically necessary.  Both of those reasons for denial dispose of Plaintiffs' claims

without the need to determine whether treatment by Uinta is excluded by the Plan.

### ORDER

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 25) is

DENIED.  Defendants' Motion for Summary Judgment (ECF No. 24) is GRANTED, although

the court declines to grant Defendants' request for an award of fees and costs.[14]

DATED this 25th day of July, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

---

[14] Defendants, in their opposition to Plaintiffs' Motion for Summary Judgment, request attorneys' fees and costs.  (See Defs.' Opp'n to Pls.' Mot. Summ. J. at 25–26, ECF No. 26.)  The court has discretion to award the Plaintiffs their fees and costs under ERISA.  29 U.S.C. § 1132(g)(1); Van Steen v. Life Ins. Co. of N. Amer., 878 F.3d 994, 1000 (10th Cir. 2018).  The court finds that such an award is not called for in this case.